IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARY TRAPANI                  :        CIVIL ACTION
                              :
        v.                    :
                              :
GREATWIDE LOGISTICS SERVICES, :
LLC., et al.                  :        NO. 10-334

MEMORANDUM

McLaughlin, J.                              August 29, 2011

        The plaintiff was hired by Joseph Chandler ("Chandler")
in January 2008 as a vice president of Organizational Development
for a Pennsylvania based trucking company.  She was terminated by
Chandler in 2009 along with other employees as a result of cost
containment measures taken by the company.  The plaintiff has
brought gender discrimination and retaliation claims against
Chandler, two other co-workers, her employer and related
companies.  The defendants have moved for summary judgment and
the Court will grant the motion.


I.      The Summary Judgment Record

        A.      Background

        Defendant GWTM, LLC ("GWTM") is a Langhorne,
Pennsylvania, based trucking company specializing in the hauling
of heavy equipment, building materials, and other specialty
freight.  GWTM is a subsidiary of Greatwide Logistics Services,
Inc. ("GWLS"), an integrated logistics company headquartered in

Dallas, Texas.  Plaintiff Mary Trapani ("plaintiff") was hired by
GWTM's predecessor, Greatwide Truckload Management, LLC
("Truckload Management").

In 2007, ("Chandler") became president of Truckload
Management.  Chandler took over a company which had been
assembled through the acquisition of three separate motor
carriers.  His challenge was to convert these separate operating
entities into a single integrated business unit designed to
handle the rapidly expanding growth in freight and revenue.
During 2007, Truckload Management grew from a $240 million run
rate to one approaching $300 million, with a proposed budget for
2008 of $310 million.  The run rate is equal to the company's
adjusted gross revenue excluding its fuel surcharge revenue.
Dep. of Joseph Chandler, Ex. B to Defs.' Mot ("Chandler Dep."),
at 5-6, 66, 115-17, 140-41.

In order to assist in the consolidation of the human
resource functions and the various administrative operations at
the corporate level, and to prepare the company for further
anticipated growth, Chandler created two new staff vice president
positions, each with an annual base salary of $150,000:  (1) the
Vice President of Administration position; and (2) the Vice
President of Organizational Development position.  Chandler hired
John Rosch ("Rosch") for the VP of Administration position.
Chandler Dep. at 34, 115-16, 141-42.

The VP of Organizational Development position was designed to provide supervision over the corporate human resource functions and to serve as a liaison with the company's independent sales agents and truck operators.  The company's employee headcount was not large enough to justify a VP of Human Resources position, but an executive position could be justified if the duties were expanded to include the liaison role with the company's independent sales agents and truck operators.  Chandler Dep. at 37, 45; Dep. of Mary Trapani, Ex. C. to Defs.' Mot ("Pl.'s Dep."), at 76-77; December 24, 2007, Email and Offer Letter from Chandler to Plaintiff, Ex. D to Defs.' Mot ("12/24/07 Offer Letter").

Truckload Management's CFO, Pam Prior, whom Chandler had hired in August 2007, suggested to Chandler that he consider the plaintiff for the newly created VP of Organizational Development position.  Prior and Trapani were friends and had worked together at a previous employer.  Chandler Dep. at 36-37; Dep. of Pamela Prior, Ex. E to Defs.' Mot ("Prior Dep."), at 6-9, 11.

Chandler interviewed the plaintiff in late 2007 and made the decision to offer her the position.  In January 2008, the plaintiff began working as the VP of Organizational Development, and she reported to Chandler.  Chandler Dep. at 43, 139; Pl.'s Dep. at 47-50; 12/27/04 Offer Letter.

B.    <u>Company's Financial Difficulties and Downsizing</u>

During the summer and fall of 2008, Truckload Management's parent company, GWLS, defaulted on its banking covenants in two consecutive fiscal quarters.  The defaults caused customer and agent concerns about the long-term future of Truckload Management.  Chandler Dep. at 10-11, 142-44.

In the late summer and early fall of 2008, the subprime mortgage crisis devastated the credit markets, resulting in a worldwide recession.  Truckload Management was hard hit in every segment of its freight business.  Chandler began to look for ways to bring the Company's expenses in line with decreasing revenues. Chandler Dep. at 19, 143-44.

In October 2008, Greatwide Logistics and its affiliated companies, including Truckload Management, filed for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware.  The filing accelerated the Company's decline in that certain shippers refused to continue to do business with a motor carrier under Bankruptcy Court protection. Chandler Dep. at 14, 18-19, 144-45; Bankruptcy Order, Ex. A to Defs.' Mot.

The company's actual total revenue for 2008 equaled $287 million and fell short of the proposed budget of $310 million.  Revenues continued to plummet in 2009, ending the year

4

with $134 million in revenues, more than a 40% decline from 2008.
Chandler Dep. at 145-46.

There was also an across-the-board reduction in
independent sales agents and truck operators.  The number of
drivers declined from more than 2,000 to between 1,000 and 1,100
and sales agents dropped from about 400 to below 250.  Chandler
Dep. at 146-47.

After the bankruptcy filing, Ray Greer ("Greer"),
President and CEO of GWLS, instructed Chandler and the other
heads of Greatwide's affiliated companies to take drastic and
immediate steps to reduce expenses.  Chandler Dep. at 10, 149-50.

Chandler created a downsizing task force consisting of
himself, Pamela Prior, Timothy Hooper, Director of Financial
Planning and Analysis, and Shawn Bauder, VP and Controller.  The
task force met for the first time around November 14, 2008.
Chandler Dep. at 29-30, 150; Dep. of Timothy Hooper, Ex. G to
Defs.' Mot ("Hooper Dep."), at 4-7.

Hooper prepared four cost proposals for the downsizing
task force's consideration, dated November 20, 2008: Proposal 1
(Hiring Freeze); Proposal 2 (Region Consolidation); Proposal 3
(Executive Consolidation); and Proposal 4 (Staff Reorganization).
All four proposals were ultimately implemented for a total
savings of approximately $4.5 million.  Hooper Dep. at 7-12;
Greatwide Truckload Mgmt 2009 Operating Plan - Cost Reduction

Proposals, dated November 20, 2008 ("Greatwide Truckload Mgmt 2009 Operating Plan"), Ex. H to Defs.' Mot.

Plaintiff's position was listed on Proposal 3 –– Executive Consolidation –– as one of six senior staff positions that should be considered for elimination.  Prior and Chandler independently came to the conclusion that plaintiff's position should be one of the positions eliminated as part of the Executive Consolidation.  Prior never considered that plaintiff's position would not be eliminated.  Prior Dep. at 16-17, 21, 29; Greatwide Truckload Mgmt 2009 Operating Plan.

Prior offered to Chandler that her CFO position be eliminated.  Chandler refused her suggestion.  Chandler considered Prior a key or "A" player in Truckload's Management's operations, along with Bauder and Hooper (males).  Chandler Dep. at 119; January 25, 2009, Memo from Chandler to Greer, Ex. I to Defs.' Mot., at 102.

Just before Thanksgiving 2008, Chandler told his boss, Greer, that three of the six positions listed on Proposal 3 would be eliminated.  The three positions were VP of IT (held by Robert Hall ("Hall"), VP of Organizational Development (held by the plaintiff), and VP of Administration (held by Rosch).  They also discussed the closing of Truckload Management's Regional Office in Kenosha, Wisconsin.  Chandler Dep. at 22-25.  Chandler made the decision to eliminate plaintiff's position and terminate her

employment.  Chandler did not consult with Hove or anyone at GWLS about his decision to eliminate plaintiff's position.  Chandler Dep. at 150.

On January 22, 2009, the task force met for the last time and formalized the company's reduction plans.  On January 22, 2009, Hooper knew that the positions of the plaintiff, Rosch and Hall would be eliminated.  On January 23, 2009, Hooper prepared a draft memo documenting the task force's decisions and presented it to Chandler the following day on January 24, 2009. Hooper Dep. at 13-16.

Chandler incorporated Hooper's draft into a memo to Greer, dated January 25, 2009, explaining the various cost reduction steps to be undertaken.  Among these steps was the elimination of the positions held by the plaintiff and Rosch. The memo further explained that these terminations would not be carried out until the closing of the company's regional office in Kenosha, Wisconsin, had been accomplished and the work of that office had been successfully transferred to the corporate headquarters.  Chandler Dep. at 93-94; January 25, 2009, Memo from Chandler to Greer, Ex. I to Defs.' Mot.

The closing of the Kenosha, Wisconsin, regional office was scheduled to take place in February 2009, resulting in the elimination of more than 60 positions.  Pl.'s Dep at 92; December

16, 2008, WARN Act Letter from Truckload Management to Mayor Keith Bosman, Ex. J to Defs.' Mot.

In February 2009, the assets of Truckload Management and the related entities were sold at an auction sale approved by the Bankruptcy Court.  The plaintiff and most of the then current management personnel became employees of the new entity, GWTM. Bankruptcy Order, Ex. A to Defs.' Mot; Pl.'s Dep at 71; Am. Compl. ¶ 8.

As of April 7, 2009, the plaintiff's and Rosch's work in the closing of the Kenosha, Wisconsin, office and the consolidation of various functions at the corporate headquarters, as well as work on various transition issues relating to the asset sale of Truckload Management to GWTM, was complete.  At this time, the plaintiff and Rosch were informed of the elimination of their positions and the termination of their employment.  Chandler Dep. at 129; Pl.'s Dep at 236-37, 256.

At the time of plaintiff's termination, the company was much reduced in size and revenue.  In December 2008, the month plaintiff was offered the VP of Organizational Development position, the employee headcount was 193.  In April 2009, the month her position was eliminated, the employee headcount had decreased to 134, more than a 30% decline.  The number of independent sales agents and truck operators had also shrunk significantly.  This decline continued to worsen during 2009.

Chandler Dep. at 144-47; Pl.'s Dep. at 97-98; GWTM, LLC, 2008 & 2009 Revenue Analysis and 2007-2010 Headcount Analysis, Ex. K to Defs.' Mot.


    C.    <u>Claims of Gender Discrimination and Retaliation</u>

       The plaintiff believes that her termination was motivated by her gender, as well as her having engaged in activities that brought her into conflict with management.

       The plaintiff contends that she was treated differently from John Rosch and Eric Madison, two males whose positions were also eliminated.  When the plaintiff's and Rosch's positions were eliminated, each of them was presented with a Separation Agreement and Release providing for severance pay equal to three months of their base salary.  Pl.'s Dep. at 256; Separation Agreements and Releases for plaintiff and Rosch, Ex. L to Defs.' Mot.

       Rosch negotiated with GWTM and informed the plaintiff that he was considering agreeing to a severance package consisting of the payment of a retention bonus that had been previously denied, as well as a severance payment of three months of salary.  Pl.'s Dep. at 259-63; April 16 and 18, 2009, email correspondence between plaintiff and Rosch, Ex. M to Defs.' Mot.

       The plaintiff also negotiated with GWTM.  Like Rosch, the company agreed to pay her the retention bonus that had

previously been denied.  However, instead of the three months of
severance pay that Rosch requested, the plaintiff demanded
eighteen months of severance pay.  GWTM did not agree to eighteen
months of severance pay, and the parties never reached a
negotiated agreement regarding the plaintiff's termination.
Chandler Dep. at 151; Pl.'s Dep. at 262-65, 267.

   The plaintiff also believes that Eric Madison
("Madison") was treated differently.  Madison was the Regional
Vice President of the Midwest Region overseeing the Kenosha,
Wisconsin, facility.  Unlike the plaintiff, Madison was given a
sixty-day notice period prior to his termination date, as were
all Kenosha employees terminated as a result of the closing of
the Regional Office.  Pl.'s Dep. at 237-38; April 30, 2009,
Letter from Truckload Management to Madison, Ex. N to Defs.' Mot.

   The plaintiff contends that she was also subject to
criticism that may have been related to her gender.  For
instance, Chandler testified at his deposition that all four of
the regional vice presidents with whom the plaintiff worked were
men, and that all complained about her "style."  Chandler Dep. at
135-36.  On another occasion, the plaintiff had a dispute with
another female employee, and Chandler suggested to the plaintiff
that she might be exaggerating the problem due to jealousy over
the other employee's looks.  Pl.'s Dep. at 223.

The plaintiff also testified that in January or February of 2009, Rob Newell - a vice president of Greatwide Dedicated Transport, another subsidiary of GWLS - made a statement that corporate GWLS does not like dealing with women in power or with New Yorkers.  Newell had no input into the decision to eliminate the plaintiff's position and terminate her employment.  Nonetheless, the plaintiff reported the comment to Chandler, who in turn reported it to Hove.  Chandler Dep. at 123-24; Pl.'s Dep. at 193-95.

The plaintiff also believes that she was terminated in retaliation for engaging in certain protected activities while employed at Truckload Management and GWTM.  During her employment, the plaintiff made several complaints about the way in which she had been treated by management.  The plaintiff testified that she first complained to Chandler on January 23, 2009, when she responded to an email labeled "Wasted Time" that Chandler had sent to her, Prior, and Rosch.  Chandler Dep. at 102; Pl.'s Dep. at 234-35.  In the "Wasted Time" email, Chandler had complained about spending much of the week apologizing for staff errors, and requested that the errors stop as soon as possible.  Chandler Dep. at 102; 104-06; January 23, 2009, email from Chandler to plaintiff, Prior, and Rosch, Ex. O to Defs.' Mot., at 2.

In her email response to Chandler, the plaintiff admitted that she had made errors, but also claimed that she had experienced "some very unfair treatment" and had been attacked by the management team.  January 23, 2009, response email from plaintiff to Chandler, Ex. O to Defs.' Mot. at 1.  The plaintiff did not mention her gender in that email.  When asked at her deposition what she meant about being treated unfairly by people on the management team, the plaintiff testified that she did not know what she specifically had in mind.  Pl.'s Dep. at 249-52. Chandler made the decision to eliminate plaintiff's position prior to his January 23, 2009, "Wasted Time" email.  Chandler Dep. at 22-25; Hooper Dep. at 13-16.

On February 16, 2009, the plaintiff emailed a draft letter to John Hove - the General Counsel for GWLS - that she had written to the entities purchasing Truckload Management's assets. Pl.'s Dep. at 156-57; Dep. Of John Hove, Ex. P to Defs.' Mot. ("Hove Dep."), at 20-21; February 16, 2009, email from plaintiff to Hove with attached draft letter, Ex. Q to Defs.' Mot ("draft letter to Hove").  In the draft letter, the plaintiff complained about Chandler's abusive, harassing, and humiliating treatment of her, Rosch (male), and Clare Yeager ("Yeager")(male).  The plaintiff never accused Chandler of abusing, harassing, or humiliating her because of her gender or of doing the same to Rosch or Yeager because of their gender.  Pl.'s Dep. at 200-03;

12

draft letter to Hove.  Prior to the plaintiff's employment termination in April 2009, Chandler was not aware of the draft letter that the plaintiff had emailed to Hove on February 16, 2009.  Chandler Dep. at 150-51.

Hove responded to the plaintiff's February 16, 2009, email and draft letter the same day he received them.  Hove told the plaintiff that if she wanted to send the draft letter, it was her decision; Hove explained that he would not tell the plaintiff not to send the letter.  Pl.'s Dep. at 158-61.

Hove testified that no statements in the letter suggested to him the possibility of retaliation based on a legally protected right.  Rather, the draft letter indicated to Hove an apparent disagreement between the plaintiff and Chandler, which the plaintiff feared might lead to her discharge.  Hove Dep. at 24-25.

During a subsequent telephone conversation between the plaintiff and Hove on or about March 5, 2009, Hove explained that if the plaintiff wished him to do so, he would investigate her concerns.  The plaintiff decided that she would rather try to resolve her issues with Chandler herself, and she told Hove not to conduct an investigation.  Pl.'s Dep. at 167-68.

The plaintiff contends that during the March 5, 2009, telephone call, Hove minimized her complaints as a personality clash, and had an indignant manner.  The plaintiff testified that

Hove's reference to a personality clash constitutes hostility. The plaintiff cannot provide any precise words that Hove used during this telephone conversation, but she believes that he may have used the word "missy" or "young lady."  Pl.'s Dep. at 170-74, 176, 195-96.  At the time of the March 5, 2009, telephone call between the plaintiff and Hove, Hove was not aware that the plaintiff's position had been targeted for elimination.  Hove Dep. at 16-19.

Hove followed up with the plaintiff in an email on March 16, 2009, to see if she still had issues with Chandler. The plaintiff responded that she was working on her concerns on her own, and that she would let Hove know if she needed help in the future.  The plaintiff never again contacted Hove about the matter.  Pl.'s Dep. at 168-70; March 16, 2009, email correspondence between plaintiff and Hove, Ex. S to Defs.' Mot.

The plaintiff contends that similarly-situated males Richard Panuski ("Panuski"), Rosch, and Yeager complained to Hove and were not treated with similar hostility.  However, the plaintiff has no firsthand knowledge of any complaints made to Hove by Panuski, Rosch, or Yeager concerning Chandler's treatment of them.  Pl.'s Dep. at 177-85.[1]

---

[1]Of the three individuals named by the plaintiff, only Panuski mentioned Hove by name.  Both Rosch and Yeager commented only that they had made complaints, but did not specify to whom they were made or what they were concerning.  Pl.'s Dep. at 177-85.

Apart from her complaints to management, the plaintiff believes that her termination was also motivated by her efforts to protect the rights of other employees.  Prior to plaintiff's employment with Truckload Management, she had experience in the human resource area by providing such services to prior employers.  Pl.'s Dep. at 25-26, 29-36.

The plaintiff's duties at Truckload Management included the supervision of the company's human resource functions.  In furtherance of these duties, the plaintiff was involved in addressing a number of personnel issues involving employee discipline, complaints, or requests.  It was the plaintiff's job to advise operations management with respect to employee rights under applicable laws and to oversee compliance with those laws, such as the Family Medical Leave Act ("FMLA").  For instance, on several occasions, the plaintiff counseled Chandler that certain employees could not be fired or reduced to part-time status, because they were entitled to protection under the FMLA.  The plaintiff testified that situations where she sought to protect the rights of other employees constituted "routine" human resource functions.  She also testified that the "right" thing was done in all cases and none of the employees' rights were violated, with the exception of a case involving Colleen Sheridan ("Sheridan").  Pl.'s Dep. at 268-75, 286, 298; 12/24/07 Offer Letter.

15

Sheridan complained to Chandler about the plaintiff's treatment of her after the plaintiff informed Sheridan that she was inappropriately dressed.  Chandler considered Sheridan's conduct to be insubordinate and on December 1, 2008, Chandler recommended that her employment be terminated.  The plaintiff, however, wanted to counsel Sheridan instead of terminate her. The plaintiff believed that it was against the law to terminate Sheridan's employment because she had made a complaint, even if the complaint was unrelated to a protected category such as those provided for under Title VII or the ADA.  Nonetheless, Chandler terminated Sheridan.  Chandler Dep. at 80-82; Pl.'s Dep. at 298-99; November 12 and 13, 2008, email correspondence between plaintiff and Sheridan, Ex. R to Defs.' Mot.; November 25 and 26, 2008, email correspondence email between plaintiff and Chandler, Ex. R to Defs.' Mot.

II.  Procedural History

The plaintiff filed a complaint on January 26, 2010, and a first amended complaint on May 7, 2010, naming GWTM, GWLS, Chandler and Hove as defendants.  In her amended complaint, the plaintiff asserts gender discrimination claims against GWTM and GWLS based on Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) and (a)(2) (Counts I and II), and a gender discrimination claim against GWLS

based on the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S. § 955(a) (Count IV).  The plaintiff also asserts retaliation claims against GWTM and GWLS based on Title VII, 42 U.S.C. § 2000e-3 (Count III), and retaliation claims against GTWM, GWLS, Chandler and Hove based on the PHRA, 43 Pa. C.S. § 955(d) (Count V).

On January 18, 2011, the defendants filed a motion for summary judgment on all counts.  The Court held oral argument on the motion on March 9, 2011, and will now grant the motion.

III. <u>Analysis</u>

The defendants move for summary judgment on all claims.[2] The defendants argue that the gender discrimination claims must fail because there is no evidence that the plaintiff's gender was a factor in the decision to eliminate her position.  Instead, the plaintiff's termination was motivated by non-discriminatory

---

[2] Summary Judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, however, the non-moving party must establish the existence of each element of its case.  <u>J.F. Feeser, Inc. v. Serv-A-Portion, Inc.</u>, 909 F.2d 1524, 1531 (3d Cir. 1990)(citing <u>Celotex</u>, 477 U.S. at 323).

reasons related to economic difficulties.  In addition, the
defendants argue that the plaintiff's retaliation claims must
fail because the plaintiff did not engage in protected activity,
and the plaintiff cannot show any causation.

Finally, the defendants contend that all claims against
GWLS and Hove fail for the additional reasons that the plaintiff
was never employed by GWLS, and neither GWLS nor Hove engaged in
any adverse action with regard to the plaintiff.


A.   Gender Discrimination Claims (Counts I, II & IV)

The Supreme Court's decision in McDonnell Douglas Corp.
v. Green, 411 U.S. 792 (1973), governs the plaintiff's Title VII
and PHRA discrimination claims.  See Jones v. Sch. Dist. of
Phila., 198 F.3d 403, 409 (3d Cir. 1999).  Under the McDonnell
Douglas framework, a plaintiff alleging gender discrimination
must establish by a preponderance of the evidence a prima facie
case of discrimination: (1) she is a member of a protected class;
(2) she was qualified for the position she held or sought; (3)
she was subject to an adverse employment action; and (4)
similarly situated men were treated more favorably, or that other
circumstances exist that give rise to an inference of unlawful
discrimination.  Id. at 410-12.  To support a claim of disparate
treatment, the plaintiff must establish "some causal nexus"

between her gender and the decision to terminate her.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003).

If the plaintiff establishes a prima facie case of discrimination, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action.  McDonnell Douglas, 411 U.S. at 802.  If the defendant can do so, then the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's articulated reason is a pretext for discrimination.  Id. at 804-05.

The plaintiff may rebut the defendant's articulated reason and defeat summary judgment by pointing to "some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Jones, 198 F.3d at 413.

The defendants concede that the plaintiff has satisfied the first three elements of a prima facie case.  The defendants contend, however, that the plaintiff has failed to show that any circumstances exist that give rise to an inference of discrimination.

19

To establish an inference of discrimination, the plaintiff contends that she was treated differently from two "similarly-situated" males – John Rosch and Eric Madison, whose positions were also eliminated.  The plaintiff contends that Rosch was permitted to negotiate a severance package with GWTM, and succeeded in obtaining more money than had originally been offered.  By contrast, the plaintiff was unsuccessful in her attempts to negotiate for additional money.  In addition, Eric Madison received sixty-days advance notice of the elimination of his position, whereas the plaintiff received none.

In order to identify similarly-situated employees, the plaintiff must demonstrate that those employees and the plaintiff shared relevant aspects of employment, such as job function, level of supervisory responsibility and salary, "as well as other factors relevant to the particular workplace."  Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir. 2004); Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002).

The Court is skeptical that the plaintiff has identified similarly-situated employees who were treated more favorably than she.  Although it appears from the record that Rosch and the plaintiff were similarly situated,[3] the facts do not

---

[3] Rosch and the plaintiff were similarly situated insofar as both of their positions were created by Chandler to assist with the consolidation of functions at the corporate level and to prepare Truckload Management for further growth.  Both the plaintiff and Rosch were vice presidents, and each had a base

suggest that Rosch was treated differently from the plaintiff. The plaintiff argues that Rosch was permitted to negotiate his severance package and the plaintiff was not.  The facts in the record, however, reveal that both individuals had an opportunity to negotiate with GWTM.[4]  After GWTM offered Rosch a retention bonus that had initially been denied, GWTM made the same offer to the plaintiff.  However, whereas Rosch had requested three months of severance pay, the plaintiff requested eighteen months, which GWTM denied.  There is no evidence that the plaintiff ever proposed, or was willing to accept, the same terms that Rosch had negotiated.  No reasonable juror could conclude based on these facts that Rosch was treated more favorably than the plaintiff.

In addition, the Court is not convinced that Madison was similarly situated to the plaintiff.  Whereas the plaintiff and Rosch both occupied vice president positions created by Chandler to facilitate the growth of Truckload Management and consolidate functions, Madison was a regional vice president who was in charge of the Kenosha, Wisconsin operation.  Apart from sharing a base salary of $150,000, it is not clear from the record that Madison and the plaintiff shared job functions.

---

salary of $150,000.

[4] Indeed, at her deposition, the plaintiff ultimately admitted that she had the opportunity to negotiate with GWTM. Pl.'s Dep. at 264-65.

Assuming, *arguendo*, that Madison and the plaintiff were similarly situated, the plaintiff is correct that Madison was treated differently, insofar as he received advance notice of his termination and the plaintiff did not.  Nonetheless, all employees at the Kenosha, Wisconsin office received sixty-days advance notice.  <u>See</u> Pl.'s Dep. at 237-38.  These facts do not support an inference that Madison's different treatment was in any way causally related to his gender.  Instead, it appears that the advance notice was motivated by federal and state notice requirements arising out of the closure of the Wisconsin facility.  <u>See</u> April 30, 2009, Letter from Truckload Management to Madison, Ex. N to Defs.' Mot; December 16, 2008, WARN Act Letter from Truckload Management to Mayor Keith Bosman, Ex. J to Defs.' Mot.

The record does not otherwise support an inference of unlawful discrimination.  The plaintiff points to comments by four male regional vice presidents, who complained to Chandler about the plaintiff's "style," Chandler's comment suggesting that the plaintiff might have been jealous of a female employee's looks, and Newell's comments about Texans having troubles with strong women in the workplace.

The comments by the male regional vice presidents were related to the plaintiff's tone during a conference call.

Chandler Dep. at 60-61.  It is not clear that they were related to the plaintiff's gender.

Newell worked for a separate subsidary of GWLS - Greatwide Dedicated Transport - and had no influence over decisions with respect to the plaintiff's employment.  Further, after the plaintiff reported the comment to Chandler, Chandler acted on the comment and reported it to Hove.  Newell's comments therefore cannot raise an inference of unlawful discrimination.

Chandler's comments that the plaintiff may have been jealous of another employee's looks do not suggest unlawful discrimination.  At her deposition, the plaintiff explained that the female employee in question had complained about the plaintiff's behavior to Chandler, and had suggested to Chandler that the plaintiff was jealous of her looks.  Chandler, in turn, suggested this possibility to the plaintiff.  Pl.'s Dep. at 222-23.  (Ex. A to Reply).  Therefore, this comment did not originate with Chandler.  In addition, there is no evidence that the comment was in any way related to the plaintiff's employment.  Indeed, the Court notes that Chandler, who made the decision to eliminate the plaintiff's position, also made the decision to hire the plaintiff in the first place.  This further undermines any inference of unlawful discrimination.

The Court is therefore skeptical that the plaintiff has established a prima facie case of gender discrimination.  Even if

the plaintiff could establish a prima facie case of discrimination, however, the defendant has satisfied its burden of production by establishing a legitimate, non-discriminatory reason for the plaintiff's termination.

The record is clear that the defendant companies were experiencing financial difficulties at the time of the plaintiff's termination.  By the fall of 2008, Greatwide Logistics had defaulted on its banking covenants for two consecutive fiscal quarters, and in October 2008, Greatwide Logistics and its affiliated companies filed for bankruptcy.  The plaintiff argues the defendants were not actually in financial trouble, notwithstanding the bankruptcy.  At her deposition, the plaintiff testified that Chandler had explained to his employees that Truckload Management[5] was not in financial trouble, but instead was using bankruptcy as a vehicle to restructure its bank loans.  Pl.'s Dep. at 92-93.  Chandler, in turn, testified that the company eliminated 77% of its debt as a consequence of the bankruptcy.  Chandler Dep. at 155-60.

The facts in the record belie the plaintiff's argument. As an initial matter, the purpose of bankruptcy is to reduce debt, and therefore a 77% reduction in debt cannot suggest the

---

[5]As noted above, Truckload Management was the plaintiff's employer prior to the asset sale to GWTM.

24

absence of financial difficulty.[6]  Indeed, the defendant companies'

bankruptcy filing precipitated a significant decrease in revenue,

as certain shippers refused to continue to do business with a

company in bankruptcy.  In response to the financial

difficulties, Ray Greer, the CEO of Greatwide Logistics,

instructed Chandler to take drastic steps to reduce expenses.

This led to the creation of a downsizing task force, which

ultimately led to the elimination of several positions, including

the plaintiff's.  By April 2009, the month when the plaintiff was

terminated, the employee headcount was 139, down from 193 the

month the plaintiff was offered the position as VP of

Organizational Development.

        Based on the record, the Court concludes that the

defendant has satisfied its burden and has established a

legitimate, non-discriminatory reason for the plaintiff's

termination.  The burden accordingly shifts back to the plaintiff

to establish that the defendants' downsizing was mere pretext for

unlawful gender discrimination.  The plaintiff may establish

pretext based on evidence by which a factfinder could: (1)

disbelieve the employer's articulated legitimate reasons; or (2)

---

[6]In the deposition testimony to which the plaintiff cites,
Chandler was specifically asked why it was necessary to eliminate
positions if the bankruptcy proceedings had eliminated bank debt.
In response, Chandler testified that it was "[t]o react to the
lack of revenue ... My division lost millions of dollars."
Chandler Dep. at 160.

believe that discrimination was more likely than not a motivating or determinative cause of the employer's action.  <u>Jones</u>, 198 F.3d at 413.

The plaintiff relies on the following arguments in order to establish pretext: (1) the defendants were not actually in financial difficulty; (2) Chandler testified that the plaintiff's work was "adequate" and would not have been grounds for termination;[7] and (3) after the plaintiff was replaced, another female was hired as Supervisor of Human Resources.[8]  <u>See</u> Pl.'s Dep. at 301.

These facts cannot establish pretext.  As noted above, the record is clear that the defendant companies were in financial difficulty.  In addition, the fact that Chandler considered the plaintiff's work to be adequate is consistent with the defendants' proffered rationale that the plaintiff was terminated for economic reasons that were unrelated to her performance.  Finally, the plaintiff acknowledged at her deposition that the female hired as Supervisor of Human Resources did not assume the plaintiff's position, and did not have the

---

[7]<u>See</u> Chandler Dep. at 129-30.

[8]The plaintiff makes additional arguments for pretext, which echo the same arguments that the plaintiff made in support of her prima facie case of discrimination.  The Court need not repeat its analysis, and instead relies on its earlier discussion in reaching the conclusion that the record cannot support an inference of pretext.

same level of responsibility.  Pl.'s Dep. at 301.  The fact that the Supervisor of Human Resources was female further undermines any inference of gender discrimination.

The Court therefore concludes that the plaintiff has failed to establish a prima facie case of discrimination.  Even if she could, however, the Court concludes that the defendant has established a legitimate, non-discriminatory reason for the plaintiff's termination.  Accordingly, the Court will grant summary judgment on the plaintiff's gender discrimination claims against GWTM.

In addition, the Court concludes that the plaintiff's gender discrimination claims against GWTM's corporate parent, GWLS, must also fail.  The plaintiff contends that GWLS is liable for the discriminatory acts of Chandler, because Chandler was a senior GWLS executive and GWLS had actual or constructive notice of Chandler's conduct.  However, the record does not support the plaintiff's claim that Chandler was employed by GWLS.  Instead, Chandler testified during his deposition that he was employed by Greatwide Logistics Management, which is not a party to this litigation.  Chandler Dep. at 10-11.  Greatwide Logistics Management is a subsidiary of GWLS, and exists to employ senior executives of GWLS and its various subsidiary companies. Chandler Dep. at 11; Aff. of Brad Eagelston ("Eagelston Aff."), Ex. E to

27

Defs.' Reply, ¶¶ 7-8.  Chandler was never an employee of GWLS. Eagelston Aff. ¶ 9.

The plaintiff's claims against GWLS must fail for the additional reason that the Court has found no evidence of unlawful discrimination on behalf of Chandler or GWTM.  As a consequence, there can be no liability attributed to the parent, GWLS.  The Court will therefore grant summary judgment on all of the plaintiff's gender discrimination claims.

B.  <u>Retaliation Claims (Counts III & V)</u>

To establish a prima facie case of retaliation under Title VII and the PHRA, a plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) her employer took an adverse action against her; and (3) a causal link exists between the protected activity and the employer's adverse action.  <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340-41 (3d Cir. 2006); <u>see also</u> <u>Slagle v. County of Clarion</u>, 453 F.3d 262, 265 n.5 (3d Cir. 2006) (noting that analysis is identical for Title VII and PHRA claims).  As with a claim for gender discrimination, if the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action.  If the defendant satisfies this burden, the burden then shifts back to the plaintiff to demonstrate that retaliation was the real reason for the action.

<u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500-01 (3d Cir. 1997).

To establish protected activity, the plaintiff relies on: (1) her response to Chandler's "Wasted Time" email; (2) the draft letter the plaintiff sent to Hove complaining about Chandler's treatment of her and other employees; and (3) her efforts to protect the rights of other employees.

In order to establish protected activity for Title VII and PHRA purposes, the plaintiff must show that she either participated in certain Title VII proceedings or opposed discrimination made unlawful by Title VII and the PHRA.  The plaintiff must hold an "objectively reasonable belief" that the activity she opposed is unlawful under Title VII.  <u>Moore</u>, 461 F.3d at 341.

The Court is not convinced that the plaintiff engaged in protected activity by responding to Chandler's "Wasted Time" email or sending a draft letter to Hove.  Neither email referenced conduct that is made unlawful by Title VII or the PHRA.  Instead, the plaintiff articulated generalized grievances, and at no time did she reference her gender or suggest that the complained-of treatment could have been motivated thereby.  The Court of Appeals for the Third Circuit has required more than "general complaints of unfair treatment" in order for a plaintiff

to engage in protected activity.  See, e.g., Barber v. CSX
Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995).

The Court is also not persuaded that the plaintiff
engaged in protected activity by protecting the rights of other
employees.  The plaintiff testified that on multiple occasions,
she resisted Chandler's efforts to terminate certain employees or
reduce them to part-time status, because those employees were
protected by the Family Medical Leave Act.  The plaintiff
explained that in those circumstances, she often encountered
"push back" from Chandler, but in most cases, the employees'
rights were ultimately not violated.  Pl. Dep. at 297-98.  The
Court finds these facts to be consistent with the plaintiff's
role as VP of Organizational Development, which encompassed the
supervision of company human resource functions.  It is not clear
that by performing the human resource functions of her job, the
plaintiff was engaging in protected activity.  Indeed, the
plaintiff described these activities as "routine" HR functions.
Pl.'s Dep at 286.  Other courts have concluded that HR
professionals do not engage in protected activity unless they
step out of their HR role and engage in activity that is adverse
to their employer.  See, e.g., Atkinson v. Lafayette College, 653
F. Supp. 2d 581, 598 (E.D. Pa. 2009) (collecting cases in context
of Fair Labor Standards Act and Title VII).

Although the Court is skeptical that the plaintiff engaged in protected activity, it need not resolve this question because it concludes that the plaintiff cannot establish a causal connection between the purportedly protected activity and her termination.[9]  With respect to the plaintiff's response to Chandler's "Wasted Time" email and her draft letter to Hove, the record is clear that both of these events occurred after the decision to eliminate the plaintiff's position had been made. The task force proposal suggesting that the plaintiff's position be eliminated was dated November 20, 2008.  Before Thanksgiving 2008, Chandler informed his boss, Greer, that the plaintiff's position was among those to be eliminated.  The plaintiff's emails to Chandler and Hove, however, were not sent until January and February 2009, respectively.  No reasonable juror could conclude based on these facts that the plaintiff's emails were causally related to her termination.

Similarly, the record is not clear on the precise dates when the plaintiff protected the rights of other employees.  In their reply brief and at oral argument, defense counsel stated that these events occurred after November 2008, when the decision had been made to eliminate the plaintiff's position.  See Defs.' Reply at 37; Tr. of Oral Arg. on March 9, 2011 ("Tr."), at 35.

---

[9] It is undisputed that the plaintiff suffered adverse action when she was terminated.

31

Plaintiff's counsel has not disputed this fact.  Instead,
plaintiff's counsel argues that the date when the decision was
made to terminate the plaintiff is not of consequence.  Instead,
the April 2009 date when the plaintiff was actually terminated is
the pivotal date, because the defendants could have changed their
mind and not terminated the plaintiff.  Tr. at 37-38.

The Court is not persuaded by the plaintiff's argument.
The plaintiff has cited no facts to suggest that the defendants
ever revisited their decision to terminate the plaintiff once it
had been made.  Indeed, all three of the defendants whose
positions were slotted for elimination on Proposal 3 of the task
force recommendation were ultimately terminated as planned.  No
facts in the record give rise to a causal connection between the
plaintiff's activities and her termination.

The Court therefore concludes that the plaintiff has
failed to establish a prima facie case of retaliation.  However,
as noted above, even if the plaintiff were able to establish a
prima facie case, the defendants have established a legitimate,
non-discriminatory reason based on economic motives.
Accordingly, the Court will grant summary judgment on the
plaintiff's retaliation claims.[10]

---

[10]The Court will grant summary judgment on the retaliation
claims against Hove and GWLS for the additional reasons that
Chandler, who terminated the plaintiff, was never employed by
GWLS.  In addition, the plaintiff has cited to no evidence
suggesting that Hove was involved in the decision to terminate

IV.   <u>Conclusion</u>

The plaintiff has failed to establish a prima facie case of gender discrimination or retaliation under Title VII and the PHRA.  Even if she could, the defendants have established a legitimate, non-discriminatory rationale for the plaintiff's termination.  The Court will grant the defendants' motion for summary judgment on all claims.

An appropriate order shall issue separately.

---

the plaintiff.  Indeed, Chandler testified that he did not consult anyone at GWLS - including Hove - about the decision to terminate the plaintiff.